Filed 3/3/25  P. v. Spann CA3
Opinion following transfer from Supreme Court

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>NICORY MARQUIS SPANN,<br><br>　　　Defendant and Appellant. | C092586<br><br>(Super. Ct. No. 17FE012187)<br><br><br>OPINION ON TRANSFER |

Defendant Nicory Marquis Spann shot a Sacramento County Sheriff's Deputy in the face at a light rail station in Sacramento.  On appeal, Spann sought reversal of his convictions for attempted murder and assault on a peace officer with a semiautomatic weapon or, alternatively, remand for resentencing due to a retroactive change to the procedures for selecting upper term sentences.  We affirmed both the convictions and the sentence, but our Supreme Court granted review and transferred the case back to this court with directions to vacate our decision and consider whether *People v. Lynch* (2024) 16 Cal.5th 730 (*Lynch*) requires resentencing Spann.

1

The parties have filed supplemental briefs and agree the case should be remanded for resentencing. Accordingly, we will affirm Spann's convictions and remand for resentencing.

BACKGROUND

A. *Evidence at Trial*

Spann spent the night in a park after being kicked out of his father's house. The next day, he rode the light rail to the Watt Avenue and Interstate 80 station at the end of the line. He spoke with transit agent Angelah Cannon, who told him he would have to leave the lower platform where the trains arrived if he did not have a ticket. Spann responded: "I don't trust you. You're the fucking police." Cannon led Spann to the upper platform. Two hours later, she saw him seated on the lower platform again.

Around the time Cannon saw Spann back on the lower platform, Deputy Alex Ladwig arrived at the station. Deputy Ladwig worked for the Sacramento County Sheriff's Department in the Sacramento Regional Transit Division. His duties included checking fares at light rail stations, responding to calls from the public or transit agents, and investigating crimes connected to the light rail system.

While patrolling the light rail station, Deputy Ladwig asked a woman smoking a cigarette on the lower platform to move to the designated smoking area. Spann, who was standing nearby, began moving erratically and yelling profanities at Deputy Ladwig and calling him a "racist pig" and "cracker cop," among other things. Deputy Ladwig asked Spann if he was okay, and Spann began to walk away. Spann calmed down once he was farther away, so Deputy Ladwig returned to his patrol car.

At this point, a woman whom Spann had been following and touching walked over to the deputy's car and told the officer that Spann had been touching her. Spann then turned around and approached the patrol car. Deputy Ladwig got out of his car and walked toward Spann to check his fare. At the deputy's approach, Spann continued angrily yelling profanities, while clenching his teeth and balling up his fists.

2

Deputy Ladwig asked to see Spann's ticket, which Spann eventually produced. Finding the ticket expired, the deputy asked Spann to purchase another ticket or leave the station. Spann began walking away, but toward the path to the next station rather than toward a ticket machine or out of the station. Spann continued acting erratically and turned back to continue yelling at the deputy. Deputy Ladwig then told Spann to stop so that he could give him a citation. The deputy asked for Spann's identification, but Spann said he did not have identification. Deputy Ladwig then asked Spann for his name. At first, Spann did not respond, but after repeated requests, he began saying his name very loudly and quickly so that the deputy could not understand. In between shouting his name multiple times, Spann continued behaving erratically and using profanities.

After several repetitions, Spann again walked away, but Deputy Ladwig followed him and asked him to take a seat on a bench in the station. Spann sat down, but refused to say his name slowly enough for the deputy to understand. A train pulled into the station, and a transit agent who had just gotten off saw the situation and called for backup over the radio.

Deputy Ladwig wanted to keep Spann detained until backup arrived, which he expected to take at least 10 minutes. At some point, Spann stood up but sat back down when the deputy told him to. When Spann stood up again, Deputy Ladwig unholstered his Taser, held it by his side, and said he would tase Spann unless he sat down. Spann acted like he was going to sit back down, but as soon as the deputy's Taser clicked back into the holster, Spann lunged at him.

Spann wound up to punch Deputy Ladwig. The deputy took a defensive stance, and Spann backed off. The deputy then tried to grab Spann and control his arms. After several seconds of struggling, Deputy Ladwig felt Spann tugging at his gun. The two men tripped and fell. As he was falling, the deputy felt the mechanism securing his gun in its holster release. Deputy Ladwig landed on his back. Spann landed on his knees

above the deputy with the deputy's gun in his hand. Spann then shot the deputy in the face from only a few inches away.

Deputy Ladwig pushed Spann off him, and Spann's second shot narrowly missed the deputy's face. The deputy ran to his car to try to grab another gun, but could not find one. Deputy Ladwig then ran to seek cover behind some bike lockers, with Spann following and waving the gun above his head in a celebratory manner. A bystander who had been recording the fight with a cell phone told Spann he had better get out of there before the police came to get him, at which point Spann stopped and looked around. Spann then walked over to a storm drain, dropped the gun in, and walked off.

The gunshot shattered the left side of Deputy Ladwig's jaw and fractured the right side. A 13-centimeter laceration ran from the deputy's tongue back to his tonsil and over to his cheek, and part of his fractured jawbone was protruding into his mouth. He spent 11 days in the trauma intensive care unit and spent six weeks with his jaw wired shut and titanium plates holding his right jawbone together. After approximately 20 surgeries, including reconstruction of his left jawbone using a bone from his lower leg, Deputy Ladwig still has no feeling or function in 90 percent of his tongue and requires a hearing aid. He spent almost a year learning to speak again and required significant rehabilitation for the leg from which the bone was removed.

Police officers later arrested Spann at a nearby hotel. When an officer searched Spann's suitcase, they found his identification inside.

Spann testified at trial and admitted shooting Deputy Ladwig. Spann did not like police officers and thought that the deputy was harassing him. Deputy Ladwig ordered him to get on the ground, but Spann refused because police officers had previously slapped him in the face after making him get on the ground. When shown a video of him lunging at the deputy, Spann explained that he had thought about assaulting the deputy but decided not to and stepped back. When Deputy Ladwig then approached Spann to arrest him, Spann decided that he needed to use the deputy's gun before the deputy did.

4

Spann denied intending to kill the deputy when he pulled the trigger, claiming both gunshots were just reactions and the second shot was "just like normal."

While watching the video of his confrontation with Deputy Ladwig during cross-examination, Spann stated, "He said get on the ground right there. I'm not getting on the ground." The prosecutor responded, "Okay. Wait until I have a question. We already heard what you believe." Spann then stated, "I don't really give a fuck. I don't really give a fuck. He can do whatever, doesn't matter. He got shot in his face, and I'm fucking happy about that shit. He got popped, POP, POP, all in his mother fucking face. I did that shit."

B.     *Verdict and Sentencing*

The jury found Spann guilty of attempted murder of a peace officer (Pen. Code, §§ 664, 187, subd. (a)),[1] and assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)), and found true all three firearm use allegations for each offense (§ 12022.5, subds. (b)-(d)).

The probation officer prepared a presentence report recommending the trial court impose an upper term sentence for assault with a semiautomatic firearm based on seven aggravating circumstances: "[T]he crime involved great violence, great bodily harm, and acts disclosing a high degree of cruelty, viciousness, and callousness" (Cal. Rules of Court, rule 4.421(a)(1)); "defendant used a firearm at the time of commission of the crime" (*Id.*, rule 4.421(a)(2)); "defendant has engaged in violent conduct which indicates a serious danger to society" (*Id.*, rule 4.421(b)(1)); "defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous" (*Id.*, rule 4.421(b)(2)); "defendant has served a prior prison term" (*Id.*, rule 4.421(b)(3)); "defendant was on probation when the crime was committed" (*Id.*, rule 4.421(b)(4)); and

---

[1] Undesignated statutory references are to the Penal Code.

"defendant's prior performance on probation or parole was unsatisfactory" (*Id.*, rule 4.421(b)(5)). The probation report listed four juvenile adjudications—three misdemeanors and one felony—as well as seven prior convictions—four misdemeanors and three felonies. Most of these offenses had been committed more than 10 years before the time of the report, including felony convictions for the transport or sale of a controlled substance and for being an accessory to buying or receiving stolen property. The most recent felony conviction was for assault on a custodial officer.

At sentencing, defense counsel acknowledged that he had reviewed the probation report and discussed it with Spann. Spann did not object to or dispute any of the evidence presented by the probation officer. The court found the seven aggravating circumstances true. The trial court found no mitigating circumstances because Spann had demonstrated that his actions and lack of remorse were not the result of mental illness, but instead were a result of "a deep hatred." Considering these circumstances, the trial court refused to strike the firearm enhancements or impose a lesser firearm enhancement. Accordingly, the court sentenced Spann to life in prison with the possibility of parole for attempted murder of a peace officer (§ 664, subd. (e)), plus 25 years to life for the firearm enhancement (§ 12022.5, subd. (d)), and the upper term of nine years in prison for assault with a semiautomatic firearm on a peace officer (§ 245, subd. (d)(2)), plus 25 years to life for the firearm enhancement (§ 12022.5, subd. (d)). The court then stayed the sentence for assault with a firearm and the associated enhancement pursuant to section 654.

C.    *Appeal and Transfer*

Spann timely appealed arguing we should reverse his convictions for attempted murder and assault on a peace officer with a semiautomatic weapon because of prosecutorial misconduct during closing argument. The People contended that Spann forfeited this issue by failing to object and that Spann failed to demonstrate his counsel performed ineffectively by not objecting. Spann also argued he should be resentenced because of a retroactive change to the procedures for selecting upper term sentences. We

6

affirmed both the convictions and the sentence, but our Supreme Court granted review and transferred the case back to this court with directions to vacate our decision and reconsider whether the trial court should resentence Spann in light of *Lynch*, *supra*, 16 Cal.5th 730. Accordingly, we vacated our decision.

The parties submitted supplemental briefs, agreeing we must remand the case for resentencing.

DISCUSSION

I

*Prosecutorial Misconduct*

Spann contends we must reverse his convictions because of prosecutorial misconduct during closing argument. We disagree.

A.      *Closing Arguments*

In the first portion of her closing argument, the prosecutor focused extensively on how Spann's actions and his testimony at trial belied his claim that he acted in self-defense. The prosecutor then told the jury:

"And this case has had similar effects on me since I watched the video. That video was chilling to watch. Slow it down. Watch him pull back and shoot that officer in the face and have no regard for what he did. Watch him celebrate afterward. I thought about, you know, I'm raising two girls. I thought about is this the world that I want my children to be raised in. And it affected me just like yesterday affected me, and it should affect all of you.

"I watched [the bystander recording the video of the fight] in disgust. I've watched that video over and over again with the same sinking feeling, what is this world we have come to live in? And I thought I just want to keep my kids in that bubble forever. We should really all feel that way about people we love, children, significant others, whoever they may be and protect them.

7

"And it wasn't til I saw what Mr. Hollaway did that my faith was restored. Because he got off that train. He was already on the train. He could have turned his head like everyone else did that day. He got off the train when he saw that the Deputy, a human being, had been shot in the face and was bleeding profusely, as he described. And he ran over, and he took the shirt off his back to help save that officer. And who knows, maybe he did. But for Mr. Hollaway and the pressure put on his face, it was five minutes before help arrived. That restored my faith in humanity. Because not everybody is good, and not everyone will look out for our loved ones. But he didn't care what color skin the officer had. He didn't care who the officer was. He didn't help him because he was an officer and put on a uniform. He went to help him because he was a human being who had been shot in the face and could die.

"Deputy Ladwig, yes, he's a police officer. Yes, he swore to protect the public imperfect or perfect as that system may be. But he's a human being. He's somebody's grandson. He's somebody's child. He's somebody's husband. Hopefully one day despite the Defendant's best efforts, he will be somebody's father. He is a human being. And this case is not about like or dislike of police officers or injustices that have happened in the past. It's about this case, this officer, this human being, and what the Defendant did.

"Despite his very best efforts Alex Ladwig will live another day. Whether he ever goes back out on the streets or not, I don't know. It's chilling to live through something like this. And every time he would meet with me and ask me, you know, how's it going to go? The family would ask me, What's going to happen? And I always told them, I can't predict what 12 people of the community will do. I can have faith in it, but I can't predict it.

"But I always told him and the family that the truth you know it here. The truth always comes out whether it's in the court or later. The truth is something that rings true, you know it. And we saw it from the witnesses in this courtroom in this case with this

8

officer, with this human being. And the Defendant spoke his truth loud and clear for us to hear yesterday. And his truth, as he screamed it, was not, I shot this officer in self-defense. His truth loud and clear and he can never take it back, there is just no coming back from that. Mr. Spangler is a fantastic attorney, and you can't take that back. You can't fix that. His truth was that he pulled that gun out, shot the officer in the face, and he was happy he did it.

"So when you go back and you deliberate and you think about this case and this case, not out there, this courtroom, this evidence, this police officer, this human being, you let justice be served by your verdicts. I can't tell you what that justice is. That's why there are 12 of you. But you let that reflect the truth.

"And when you sign those verdict forms, you know that justice will be served. That's all I ask three years later for this officer, this family, let it be served by your verdicts."

Spann did not object to any of this argument. Instead, defense counsel addressed the prosecutor's argument at the end of his closing argument:

"Ms. Anderson is a very accomplished prosecutor. In her closing argument, she was appealing to your sympathy, to your passions. This isn't about your sympathy or your passions. This is about what you, as jurors, can arrive at logically and reasonably in drawing inferences from the evidence that you were presented.

"Again, it was a terrible thing that Deputy Ladwig was shot, and he has suffered greatly. There's no question. This isn't a question about how badly he suffered. This is a question of how did Mr. Spann act in this particular situation and is it justified. I do agree with Ms. Anderson that the truth go [*sic*] out.

"Deputy Ladwig used unreasonable force while acting outside the scope of his duties. Mr. Spann was put in unreasonable fear for his—or reasonable fear for his life and safety, and he reacted in the only manner that seemed appropriate to him at that

9

moment to preserve his life. He's not guilty of the crimes that are charged, and we look forward to you returning a not guilty verdict."

B.       *Forfeiture*

As an initial matter, the People contend Spann forfeited this claim of prosecutorial misconduct by failing to object. We agree.

"In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review." (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) Spann did not object at all during the prosecutor's closing argument.

Spann argues an exception to the forfeiture rule should apply because objection and admonition would not have cured the harm from the prosecutor's improper argument. Spann quotes *People v. Kirkes* (1952) 39 Cal.2d 719, 726, suggesting that an objection "might well have served to impress upon the jury the damaging force of the challenged assertions." Our Supreme Court has limited this language in *Kirkes*, noting: "This exception, of course, would swallow the rule requiring a timely objection and request for admonition, for one always runs the risk of drawing the jury's attention to an improper line of argument by registering an objection. The mere concern of highlighting alleged misconduct by objecting, without more, cannot serve as an exception to the general rule requiring an objection and request for an admonition." (*People v. Boyette* (2002) 29 Cal.4th 381, 432.) The prosecutor's argument in this case is not comparable to the misconduct in *Kirkes*, wherein the prosecutor asserted personal knowledge from an unidentified source not in evidence of the defendant's guilt, implied he would not have prosecuted had he not believed in the defendant's guilt, and suggested the defendant would kill again to cover his crime and prevent witnesses from testifying, with "no evidence whatever upon which to base that statement." (*Kirkes*, at pp. 723-725; see *People v. Visciotti* (1992) 2 Cal.4th 1, 80.) The *Kirkes* court also noted that the improper

10

remarks "were interspersed throughout the closing argument in such manner that their cumulative effect was devastating." (*Kirkes*, at p. 726.) Here, by contrast, the remarks to which Spann failed to object occurred all at once and take up a small fraction of the entirety of the prosecutor's closing argument.

We conclude Spann has failed to demonstrate either that an objection would not have stopped this line of argument or that an admonition would not have cured any harm. Accordingly, Spann has forfeited this issue on appeal.

C.      *Ineffective Assistance of Counsel*

Anticipating this conclusion, Spann also argues his counsel performed ineffectively by failing to object to the prosecutor's argument. We are not persuaded.

While we agree with the parties that the prosecutor committed misconduct by invoking the safety of her own children, suggesting the jurors should protect their own loved ones from Spann, and referring to conversations she had with the deputy and his family, a defendant may not "automatically transform a forfeited claim into a cognizable one merely by asserting ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 121, fn. 14; see *People v. Riel* (2000) 22 Cal.4th 1153, 1202-1203.) Rather, "[t]o establish constitutionally inadequate representation, a defendant must demonstrate that (1) counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's representation subjected the defendant to prejudice, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant." (*People v. Samayoa* (1997) 15 Cal.4th 795, 845; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-696.)

"[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson*, *supra*, 49 Cal.4th at p. 122.) " 'When a defendant on appeal makes a claim that his counsel was ineffective, the appellate court must consider whether the record contains any explanation for the challenged aspects of representation provided by

11

counsel. "If the record sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' [citation], the contention must be rejected." ' " (*People v. Samayoa*, *supra*, 15 Cal.4th at pp. 845-846.) " 'Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.)

Here, rather than objecting, defense counsel addressed the prosecutor's remarks in his own argument, pointing out to the jury that the prosecutor was improperly appealing to their "sympathy" and "passions." Defense counsel urged the jurors instead to rely on logic and reason to determine whether Deputy Ladwig used unreasonable force and whether Spann reasonably feared for his life and safety. This indicates defense counsel made a tactical decision, which we may not second-guess. Defense counsel may also have been happy to let the prosecutor talk about personal matters because it meant she stopped discussing Spann's disastrous testimony on cross-examination: "I don't really give a fuck. He can do whatever, doesn't matter. He got shot in his face, and I'm fucking happy about that shit. He got popped, POP, POP, all in his mother fucking face. I did that shit." Defense counsel could reasonably have considered that testimony, the last piece of evidence the jury heard in the case, so damaging that any other argument was a welcome distraction.

We conclude Spann has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

II

*Upper Term Sentence*

Spann contends we must remand for resentencing because amendments made to section 1170 while his appeal was pending apply retroactively and the trial court relied on

12

aggravating circumstances that were not proven according to the new procedures. The People agree that, in light of *Lynch*, *supra*, 16 Cal.5th 730, the record does not establish that the trial court's reliance on improperly proven aggravating circumstances was harmless. We agree with the parties and will remand for resentencing.

Effective January 1, 2022, the Legislature amended section 1170, subdivision (b) so that, among other things, a sentencing court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) The amended version of section 1170, subdivision (b) applies retroactively in this case as an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*Lynch*, *supra*, 16 Cal.5th at p. 749.)

Applying section 1170, subdivision (b) retroactively, "a Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." (*Lynch*, *supra*, 16 Cal.5th at p. 768.) If the facts underlying any one aggravating circumstance fail to meet this standard, "the defendant is entitled to a remand for resentencing." (*Ibid.*)

Here, none of the underlying facts for the seven aggravating circumstances the trial court relied upon were found true beyond a reasonable doubt by a jury and Spann did not stipulate to the truth of any. Because we must conclude beyond a reasonable doubt

13

that the jury would have found true the facts underlying all seven aggravating circumstances, we look first at the most uncertain of those circumstances.

We cannot conclude beyond a reasonable doubt that a jury would have found true the facts underlying the aggravating circumstance that "defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous." (Cal. Rules of Court, rule 4.421(b)(2).) This aggravating circumstance rests on a somewhat vague and subjective standard, which makes it difficult "to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.) For example, we cannot confidently say where the jury would have drawn the line for "numerous," how the jury would have weighed felonies, misdemeanors, or juvenile adjudications, or how the jury might have considered the passage of time and discounted older convictions. We are also mindful that we "cannot necessarily assume that the record reflects all of the evidence that would have been presented had aggravating circumstances been submitted to the jury." (*Id.* at p. 839.) For example, had the defense told the jury more details about the offenses, the jury could have been more likely to count convictions as minor and thus less likely to add up to the "numerous" standard.

Having determined that the facts underlying one aggravating circumstance do not meet the standard for harmless error, we must vacate Spann's sentence and remand for resentencing. "Further proceedings on remand are to be conducted in accordance with the current statutory requirements and the defendant given the opportunity for the jury trial, of which he was deprived. [Citations.] On remand, the parties remain free to introduce at trial all relevant evidence to support or contest the factual support for the aggravating circumstances set out in the California Rules of Court. The court may rely on any properly proven aggravating facts, including prior convictions or facts necessarily found by the jury to support a verdict on underlying counts and enhancements. The court retains its discretion to impose an upper term sentence if it concludes that one or more

14

properly proved circumstances justify such a sentence.  (§ 1170[, subd.] (b)(2).)  If it cannot so conclude, it may impose no more than a middle term for each of the counts on which [the defendant] stands convicted.  (*Id.*, subd. (b)(1).)”  (*Lynch*, *supra*, 16 Cal.5th at pp. 777-778.)

## DISPOSITION

Spann's convictions are affirmed, his sentence is vacated, and the matter is remanded for further litigation of the aggravating circumstances and for the court to exercise its discretion under current section 1170, subdivision (b), as indicated here.


　　　　　　　　　　　　　　　　　／s／
　　　　　　　　　　　　　　　BOULWARE EURIE, J.


We concur:


　　／s／
ROBIE, Acting P. J.


　　／s／
MAURO, J.